UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ANTHONY HUGHES,

          Plaintiff,

    v.                                CAUSE NO. 3:24cv887 DRL

AIRGAS, INC.,

          Defendant.

## OPINION AND ORDER

Airgas, Inc. hired Anthony Hughes in May 2023 and terminated him in September 2024. During his employment, he complained of racial discrimination and filed a charge with the Equal Employment Opportunity Commission. After his termination, he sued Airgas under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, alleging race discrimination and retaliation. Airgas requests summary judgment on all claims. The court grants the motion.

## BACKGROUND

Airgas hired Mr. Hughes, a Black man, as a bulk truck driver in May 2023 [30-2 at 1; 30-14]. His immediate manager was Mike Nixon [30-2]. Brad Burkhart was the assistant manager [30-14]. Mr. Hughes completed Airgas's "on the job training" on June 20, 2023 [30-7 at 26]. The next day, Mr. Nixon issued Mr. Hughes a written warning and a three-day suspension without pay because he was caught on camera not wearing his seatbelt while operating a vehicle on three separate occasions, in violation of the company's safety policy [29 ¶ 8; 30-12 at 3].

A month later, Mr. Burkhart emailed Mr. Nixon saying he observed Mr. Hughes not wearing proper footwear at work and that Mr. Hughes became "angry and irate" when Mr. Burkhart said something to him about it [30-7 at 31]. Later that afternoon, Mr. Hughes emailed

human resources, requesting to speak with someone about the morning incident and other concerns [*id.* 29-30]. Mr. Hughes reported that he was dissatisfied with aspects of his training, that he thought his punishment for the seatbelt violation was too harsh, and that, because of his race, he perceived discrimination and bias from Mr. Burkhart [*id.* 1-2, 4-6].

Human resources investigated these matters and issued a report with its findings [*id.*]. The report substantiated Mr. Hughes's complaints about his training but not his complaints about the severity of the punishment or race discrimination [29 ¶ 17; 30-7 at 1-2, 4-6]. The punishment, the report stated, was fair and consistent with the company's disciplinary guidelines [30-7 at 5]. The report noted that Mr. Nixon handed out the same discipline for seatbelt violations to at least two white drivers [*id.*].

As for Mr. Burkhart, human resources concluded that Mr. Hughes didn't report any direct experience or evidence of race-based comments—only what he perceived to be Mr. Burkhart's "adversarial [] tone and body language" [*id.*]. Human resources interviewed another Black bulk driver who said Mr. Burkhart could be irritable when interacting with bulk drivers, regardless of their race, but he didn't think he harbored any racial bias [*id.* 5-6]. The report concluded that, though Mr. Burkhart was occasionally irritable or blunt when interacting with Mr. Hughes, there was no indication that this was motivated by bias or discrimination toward him [29 ¶ 17; 30-7 at 5, 48]. Still, the company placed Mr. Burkhart on a 90-day performance improvement plan, which he successfully completed on January 18, 2024 [29 ¶ 20; 30-7 at 6, 49-50].

On October 18, 2023, Airgas received an anonymous report alleging that Mr. Hughes made an inappropriate comment at work [30-8 at 1-2]. Specifically, as reported, Mr. Hughes walked into a conference room where his coworkers were gathered for a safety meeting and said,

"so, which one of you bitches are [*sic*] going to make me a plate?" [*id.* 2]. Airgas investigated the alleged incident by interviewing several people who were at the meeting [*id.* 33-34]. Most witnesses confirmed Mr. Hughes made the comment; however, some, including Mr. Hughes, said he used the word "ladies" instead of "bitches" [*id.* 9, 12, 23, 27, 30, 33]. On October 25, an investigation report substantiated the allegation that Mr. Hughes "walked into the room and said a joke about 'which one of you, (bitches or ladies), are [sic] going to make me a plate?'" [29 ¶ 31; 30-8 at 33]. Mr. Hughes was not punished for this incident right away [30-8 at 34].

On November 1, 2023, Mr. Burkhart reported to human resources that Mr. Hughes spoke to him in a rude manner [30-9 at 3]. Specifically, Mr. Burkhart reported receiving a text message from Mr. Hughes saying he lost his work-issued hammer and there were problems with his work truck [*id.*]. Mr. Burkhart said that he went over to Mr. Hughes's truck and spoke to him about both situations [*id.*]. After Mr. Burkhart told Mr. Hughes that he needed to be more responsible with his hammers, he reported that Mr. Hughes said "fuck you, Brad, and your hammers" [*id.*]. Airgas's human resources investigated the incident, taking statements from Mr. Burkhart, Mr. Hughes, and two other employees who were also there [*id.* 1, 3-6, 7-10, 13-15]. The investigation substantiated Mr. Burkhart's allegations, finding that Mr. Hughes behaved in an angry and disrespectful manner when talking to Mr. Burkhart, including use of profanity [29 ¶ 63; 30-9 at 1, 16-17].

Later that month, Mr. Hughes received a final written warning for the October 18 and November 1 incidents [30-9 at 16-18]. The disciplinary warning advised that the two incidents "illustrate a pattern of problematic behavior" that was contrary to Airgas's code of conduct [*id.*

17]. It warned him that the behavior must not occur again and that future infractions would result in disciplinary action, up to and including termination [*id.* 16-17].

Six days later, Mr. Hughes filed an EEOC charge of discrimination alleging disparate treatment, harassment, and discriminatory practices by Mr. Burkhart because of Mr. Hughes's race and sex [30-14]. He alleged that his confidential information was released to other drivers, that he received excessive punishment for a seatbelt violation, and that he failed to receive training that other white bulk drivers received [*id.*]. He also alleged that the final warning he received for the October 18 and November 1 incidents was in retaliation for filing a complaint against Mr. Burkhart [*id.*]. He wrote that he consulted with legal counsel and listed the discrimination as a "continuing action" [*id.*].

In June 2024, another employee contacted human resources accusing Mr. Hughes of making disrespectful comments [29 ¶ 71; 30-10 at 1]. Airgas's human resources department launched an investigation and interviewed eleven employees, including Mr. Hughes, Mr. Burkhart, and Mr. Nixon [30-10 at 80-81]. The investigator also received copies of Mr. Hughes's emails and screenshots of his text messages to his coworkers [*id.*]. During the investigation, several employees reported incidents in which Mr. Hughes communicated unprofessionally or acted inappropriately [29 ¶ 72; 30-10 at 78-80].

One incident involved Mr. Hughes writing comments on a whiteboard at work mocking another employee [29 ¶ 73-75; 30-10 at 4, 25-26, 68, 78]. Another incident involved Mr. Hughes's "coaching session" with Mr. Burkhart and Mr. Nixon, where they reported Mr. Hughes was disrespectful and combative in the way he spoke to the two managers [30-10 at 13, 79]. Several interviewees reported avoiding working with Mr. Hughes because of his behavior [*id.* 80].

4

Ultimately, the investigation substantiated allegations that over several months after his final warning, Mr. Hughes communicated in a disrespectful manner with his coworkers by making sarcastic, combative, or accusatory remarks [30-1 ¶ 8; 30-10 at 77-83].

In June 2024, Mr. Hughes filed his own internal complaint against Mr. Burkhart and other staff [29 ¶ 116; 30-11 at 1-2]. As relevant here, he accused Mr. Burkhart of discriminating, harassing, and retaliating against him for filing an EEOC charge [30-11 at 1-2]. He also alleged that his documentation was being unfairly scrutinized [*id*.]. Airgas investigated these allegations, substantiating some but not others [29 ¶ 118-120; 30-11 at 14-22]. The investigation found that Mr. Burkhart's communication with Mr. Hughes was "curt, unprofessional and unresponsive" but that the evidence didn't support a finding that he treated Mr. Hughes differently because of his race or engaged in retaliation against him [30-11 at 15]. The investigation also found that Mr. Hughes's documentation wasn't being unduly scrutinized because all drivers were being held accountable for documentation errors [*id*. 16].

Reports from both June investigations were submitted to the director of human resources in August 2024 [30-10 at 77; 30-11 at 14; 30-1 ¶ 8]. Mr. Burkhart, Mr. Nixon, and other staff were disciplined because of findings that they engaged in a pattern of unprofessional behavior [30-1 ¶ 10; 30-11 at 23, 27-35]. Mr. Hughes was terminated on September 4, 2024 [30-1 ¶ 8; 30-10 at 83].

Mr. Hughes sued Airgas on September 12, 2024 in state court alleging race discrimination and retaliation in violation of Title VII. The complaint alleged that Mr. Hughes received harsher punishment for minor offenses, was subjected to more scrutiny and drug screenings, and was passed over for promotions because of his race. It also alleged that Airgas retaliated against him

because he complained about the discrimination and filed an EEOC charge by subjecting him to increased scrutiny and ultimately terminating him. Airgas timely removed this action.

STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in her favor. *Beardsall v. CVS Pharm., Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp./Nichols-Homeshield*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor is the court "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920. The court must grant summary judgment when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

Airgas requests summary judgment on all claims. The company says Mr. Hughes failed to exhaust his remedies administratively and that he cannot establish a *prima facie* case or prove pretext for race discrimination or retaliation claims. Mr. Hughes partially responds to the exhaustion argument, opposes summary judgment on the race discrimination claim, and leaves the other arguments unanswered.

A. *Procedural Issues.*

Airgas first argues some procedural issues in reply. Mr. Hughes's response violated Local Rule 56-1 and the court's dovetailing instructions. Certain of these are fairly ministerial and minor as they concern the organization and filing of his statement of material facts, which, with a smaller record, the court can excuse. *See* N.D. L.R. 56-1(b), (b)(2)(D). His response to Airgas's statement of material facts, at times, though there are only a few, declines to cite to the record or other evidence [*e.g.* 35-2 ¶ 112-113, 117], so these facts from Airgas are deemed admitted.[1] *See* N.D. L.R. 56-1(b)(2)(C); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). The court also cannot consider documents that a party has not submitted.

The summary judgment brief in the whole often provides no citation to the record (or to the oppositional factual statement), much less legal authority. The court has navigated this to foster a ruling on the merits insofar as this opinion goes, but the remainder the court treats as

---

[1] Airgas advances a hearsay argument concerning one of Mr. Hughes's statements in his deposition. This ultimately has no bearing on the outcome today, but the court notes that Airgas has the standard slightly off. True, at summary judgment, the court may only consider admissible facts. *Cehovic-Dixneuf v. Wong*, 895 F.3d 927, 931 (7th Cir. 2018). Affidavits must set out facts that would be admissible in evidence, *see* Fed. R. Civ. P. 56(c)(4), but other documents may offer facts at summary judgment so long as the party can establish that these facts could be presented in a form that would be admissible, *see* Fed. R. Civ. P. 56(c)(1), (c)(2). The proper question for documents used at summary judgment is whether the facts within them could be rendered admissible, not whether a foundation has been laid already. *See Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014); *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010). Mr. Hughes has not offered this foundation, but the fact becomes immaterial in analysis.

waived or abandoned. *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1063 (7th Cir. 2020) (arguments that are "underdeveloped, cursory, and lack supporting authority" are waived); *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (abandonment when not argued in response). The court often prefers such abandonment to be stated overtly, but the winnowing of arguments is only natural at this stage, after a party has had the opportunity to evaluate the full record.

B. *Failure to Exhaust.*

To this point of live claims, the court must decide which ones Mr. Hughes exhausted administratively and which ones he has not. A party bringing Title VII claims "must first exhaust [their] administrative remedies by filing charges with the EEOC and receiving a right to sue letter." *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019); *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992). The "rule serves a dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion, and of giving the employer some warning of the conduct about which the employee is aggrieved." *Cheek v. W. & S. Life Ins.*, 31 F.3d 497, 500 (7th Cir. 1994) (citation omitted).

A complaint meets the exhaustion requirement when its claims are "reasonably related to the allegations of the [EEOC] charge and grow[] out of such allegations." *McHale v. McDonough*, 41 F.4th 866, 870 (7th Cir. 2022) (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins.*, 538 F.2d 164, 167 (7th Cir. 1976) (*en banc*)). Claims are "like or reasonably related" when "(1) there is a reasonable relationship between the allegations in the charge and the claims in the complaint and (2) the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Chaidez*, 937 F.3d at 1004 (quotations omitted).

8

To determine whether a claim passes this two-part test, the court must carefully examine and compare the charge and the complaint. *Id.* at 1005. The charge and complaint "must, at minimum, describe the *same conduct* and implicate the *same individuals*." *Id.* at 1004 (quotations omitted). "The fact that the charge and the complaint generally assert the same kind of discrimination is not sufficient, without some factual relationship between them." *Id.* at 1005. Though a plaintiff need not "allege in an EEOC charge each and every fact that combines to form the basis of each claim in [his] complaint," *Cheek*, 31 F.3d at 500, he needs to include some specific detail beyond a general allegation that he suffered discrimination because of his race, *Rush*, 966 F.2d at 1111. Ultimately, "the scope of the complaint brought before the administrative agency limits the scope of subsequent civil proceedings in federal court[.]" *Reynolds v. Tangherlini*, 737 F.3d 1093, 1099 (7th Cir. 2013).

That said, there is no need to exhaust administrative remedies for Title VII retaliation claims when the EEOC charge is the catalyst for retaliation. *See Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 857 n.11 (7th Cir. 2019); *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 482-83 (7th Cir. 1996) (collecting cases). This is grounded in practical considerations—"avoid[ing] futile procedural technicalities and endless loops of charge/retaliation/charge/retaliation" arguments. *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1030 (7th Cir. 2013).

Airgas argues that Mr. Hughes failed to exhaust his administrative remedies because his charge omitted any allegations of race discrimination for being subjected to unwarranted scrutiny, additional drug screenings, or being passed over for promotion. Likewise, Airgas says the charge omitted allegations of retaliation—either in the form of heightened on-the-job scrutiny or his termination. Mr. Hughes defends his retaliation claim based on his termination because it relates

reasonably to his EEOC charge; but, reading his argument rather generously, he only implies that the retaliation claim may proceed based on increased scrutiny because the charge described Airgas's retaliation in "general" and "ongoing" terms.

The EEOC charge [30-14] stated that Mr. Hughes "experienced differential treatment, harassment, and discriminatory practices by [Mr. Burkhart]." It alleged that "confidential information" related to Mr. Hughes's suspension "was leaked to other drivers," that he received "excessive punishment for an on-camera seatbelt violation," and that he did not receive additional training given to white male employees. The charge also claimed that, after Mr. Hughes complained to human resources about Mr. Burkhart's behavior, he was retaliated against by being accused of making "fictitious remarks in a meeting and in [a] subsequent encounter with [Mr. Burkhart]" for which he received a "final warning and [was] threatened with termination." It reported that Mr. Hughes held "strong beliefs that this discrimination [was] systematic" because of the "ongoing discrimination and lack of support from [human resources]."

From there, the court compares which allegations in the charge are stated or reasonably related to claims asserted in the complaint, much less maintained here at summary judgment. Considering the race discrimination claims first, the complaint alleges that Airgas discriminated against Mr. Hughes by imposing harsher discipline on him for minor offenses, subjecting him to greater scrutiny and more frequent drug screenings, and denying him promotions. Airgas concedes that the EEOC charge describes one of these allegations—harsher punishment for minor offense (seatbelt violations)—else the remainder of race discrimination claims, based on a different core of operative facts about being scrutinized, drug tested, or passed over for promotion, has not been exhausted before the EEOC. This involves different conduct by the

company, and Mr. Hughes has not shown how his charge of harsher discipline encompasses this other conduct. *See McHale*, 41 F.4th at 870. And it would be unreasonable to expect the EEOC to investigate this other conduct by looking at the charge's narrative. *Id.*

Mr. Hughes cannot avoid the exhaustion requirement by using general descriptions of race discrimination in the EEOC charge. *Rush*, 966 F.2d at 1112 ("it will not suffice to file general charges with the EEOC … and then to expect that this allegation will permit all claims of race-based discrimination in a subsequent lawsuit"). He was required to state grievances in his charge with some specificity to afford fair notice, *see Cheek*, 31 F.3d 500-01 ("requirement of some specificity in an EEOC charge is not a mere technicality") (cleaned up), not least when he consulted an attorney beforehand, *see Chaidez*, 937 F.3d at 1005 n.3; *Rush*, 966 F.2d at 1112.

Describing race discrimination as "ongoing" in an EEOC charge doesn't permit Mr. Hughes to pursue claims beyond the charge's scope. Treating that label as a gateway to claims sprouting after a charge has been filed would undermine the whole purpose of the exhaustion requirement of giving employers and the EEOC proper notice. *Teal v. Potter*, 559 F.3d 687, 692-93 (7th Cir. 2009) (plaintiff failed to put employer on notice of discrimination despite listing discrimination as "continuing"); *cf. Shiba v. Mullin*, 174 F.4th 1025, 14-15 (7th Cir. 2026) (explaining that "continuing violation" doctrine may apply to hostile workplace claims). Because there is no way to read Mr. Hughes's charge as alleging grievances that are reasonably related to being subjected to heightened scrutiny, more frequent drug testing, or denial of promotions, these claims remain outside the scope of the charge and unexhausted.

Exhaustion plays out differently for his retaliation claim. Mr. Hughes's complaint alleges that Airgas retaliated against him by subjecting his work documentation to greater scrutiny and

later for terminating him because he filed an internal complaint and EEOC charge. His greater scrutiny during his ongoing employment (to the extent this might be called an adverse action) might forgive the need to exhaust. *See Ford*, 942 F.3d at 857 n.11; *Luevano*, 722 F.3d at 1030. The concern about an endless loop of charge and retaliation and then charge and retaliation makes more sense when the person remains employed (*e.g.*, related to his internal complaint), not so much when he has been terminated (*e.g.,* related to his termination after his EEOC charge). After all, how else might an employer truly retaliate against a former employee come the rather final decision of terminating him? The law nonetheless seems rather gracious in permitting a retaliation claim to proceed, without formal exhaustion, when it stems from the filing of an EEOC charge, as has been argued here.[2] *See McKenzie*, 92 F.3d at 482-83.

Thus, as exhausted, Mr. Hughes retains a race discrimination claim under Title VII based on the company's harsher discipline of him for what he views as minor seatbelt violations, and he preserves a retaliation claim under Title VII for both greater on-the-job scrutiny and termination because he complained internally and ultimately filed an EEOC charge. The other claims must be dismissed without prejudice despite also being abandoned on summary judgment. *See Teal*, 559 F.3d at 693.

C.  *Race Discrimination.*

Mr. Hughes's race discrimination claim theorizes that he received greater punishment than others for violating Airgas's seatbelt policy. Airgas says Mr. Hughes cannot prove that other

---

[2] Mr. Hughes has not argued he exhausted administrative remedies in treating his later termination as discriminatory as opposed to retaliatory, which might have led to a different result there. *See Teal*, 559 F.3d at 692.

drivers, who were not members of his protected class, received less severe discipline or that the punishment was pretextual. Mr. Hughes offers two comparators but leaves pretext unaddressed.

Title VII prohibits an employer from discriminating against any individual with respect to their "compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1); *see Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308 (2025). The law uses a holistic approach that poses a singular question at summary judgment: whether the evidence would permit a reasonable factfinder to conclude that Mr. Hughes's race caused an adverse employment action. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The court considers the evidence as a whole. *Id.*

Mr. Hughes can show discrimination under Title VII with direct evidence or circumstantial evidence, such as suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's stated reason for the adverse employment action was pretextual. *Galvan v. Indiana*, 117 F.4th 935, 939 (7th Cir. 2024). That said, "the well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "There is no magic to this test; it is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's race or other proscribed factor." *Johnson*, 892 F.3d at 894.

Mr. Hughes proceeds under this framework. It requires him to demonstrate that (1) he is a member of a protected class, (2) he met Airgas's legitimate expectations, (3) he suffered an

adverse employment action despite his reasonable performance, and (4) similarly situated employees who were not members of his protected class were treated more favorably. *Id.* at 895; *see also Cunningham v. Austin*, 125 F.4th 783, 788 (7th Cir. 2025) (proceeding under the *McDonnell Douglas* framework because the parties did). If Mr. Hughes establishes his *prima facie* case, the burden shifts to Airgas "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021). If Airgas carries that burden, Mr. Hughes must present evidence that Airgas's explanation was pretextual. *Id.*

The holistic approach often makes greater sense in a disparate punishment case in which the second and fourth prongs of the indirect method merge anyway; but, proceeding nonetheless as the parties argue it today, Mr. Hughes must show "that a similarly situated employee outside [his] protected class committed a similar act but was subjected to less severe discipline." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013); *see also Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004). The employees must be comparable, in that they "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008). "But 'complete identity' with a comparator is not essential; a plaintiff simply needs evidence that a coworker's misconduct was similar enough to infer that the uneven punishments resulted from racial bias." *Hall v. Vill. of Flossmoor*, 520 F. Appx. 468, 472 (7th Cir. 2013). The purpose of having a similar comparator is "to eliminate other possible explanatory variables, such as differing roles, performance histories, or decisionmaking personnel, which helps isolate the critical independent

14

variable—discriminatory animus." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (quotations and hyphen omitted).

Mr. Hughes points to Mr. Burkhart and Mr. Colt as examples of similarly situated employees who received lesser punishment. Mr. Hughes says Mr. Burkhart received less severe punishment by being placed on a performance improvement plan whereas Mr. Hughes received a final warning, though both men violated Airgas's policy by behaving unprofessionally. But his disparate punishment claim hinges on his discipline for violating Airgas's seatbelt policy. He must have adduced evidence of comparators who committed the same or comparable seatbelt policy violations but received more favorable treatment. Mr. Burkhart is not an apt comparator on this record for the seriousness of that. *See Nigro v. Ind. Univ. Health Care Assocs.*, 40 F.4th 488, 491 (7th Cir. 2022) (comparators must be engaged in conduct of comparable seriousness); *Coleman v. Donahoe*, 667 F.3d 835, 850 (7th Cir. 2012) (comparators must have engaged in similar conduct to qualify as similarly situated).

Even if Mr. Hughes properly exhausted a claim for disparate discipline based on unprofessional behavior, the differences between him and Mr. Burkhart are too stark and significant to permit a reasonable factfinder to find for him. *See Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 575 (7th Cir. 2021) ("similarly situated employee must be directly comparable to plaintiffs in all material respects") (quotations omitted). On this record, Mr. Hughes and Mr. Burkhart differ materially in tenure, position, and disciplinary history. *See Gates*, 513 F.3d at 690 (listing factors to consider whether employees are similarly situated); *see also Shirk v. Trs. of Ind. Univ.*, 167 F.4th 460, 468 (7th Cir. 2026) (when plaintiff is a subordinate to the alleged comparator "the two are not similarly situated"). When Mr. Hughes received his final warning in November

2023, he had been employed as a bulk driver for only six months, had recently been disciplined for a seatbelt violation, and had been the subject of two separate investigations that found he had made inappropriate comments before, including cursing at Mr. Burkhart. Mr. Burkhart, in contrast, had been employed by the company for 16 months, held the hierarchically superior position of assistant manager, and had no prior disciplinary history (insofar as this record reveals) when he was placed on a performance improvement plan. These material differences in position, tenure, and personal history belie fair comparison. *See Gates*, 513 F.3d at 690.

Mr. Colt gets closer as a comparator, but he too fails to qualify as similarly situated. Mr. Colt, a white man employed by Airgas as a bulk driver, received a one-day suspension without pay and a written warning for not wearing a seatbelt on February 7, 2025. Though both Mr. Colt and Mr. Hughes violated the same policy, the circumstances of their violations are materially different. Mr. Hughes was disciplined for not wearing his seatbelt on three separate occasions, whereas Mr. Colt was found to not have worn it once. It would not be unreasonable for an employer to discipline repeat noncompliance more severely than a one-time violation, without ever raising an inference that the company must be acting out of racial bias. In addition, at the time, Mr. Colt had been employed by Airgas for 31 months as a bulk driver—29 months longer than the relative newcomer in Mr. Hughes, not least when Mr. Hughes committed his infraction while still completing his two-month job training. No reasonable jury could use these rather different scenarios as a springboard toward a finding of race discrimination.

Even so, putting the *prima facie* case aside for the moment, Mr. Hughes has not shown Airgas's reason for his punishment to be pretextual. *See Logan v. City of Chi.*, 4 F.4th 529, 537 (7th Cir. 2021). Mr. Hughes admits that the company's policy required him to wear a seatbelt when

16

making deliveries and that he violated this seatbelt policy [30-13 Tr. 61]. Airgas's internal investigation determined that Mr. Hughes's manager uniformly applied punishment to bulk drivers, regardless of their race. The company proffers five examples of white bulk drivers who were seemingly punished more severely than Mr. Hughes for a seatbelt violation. Three of these drivers received three-day suspensions without pay for a single seatbelt violation, and one received a five-day suspension without pay for a single seatbelt violation.

Mr. Hughes has not pretextualized the company's legitimate reason for discipline. It goes without saying that wearing a seatbelt would be an essential safety concern for bulk drivers, and no reasonable jury could call the company's rationale phony on this record. *See Teruggi v. CIT Grp./Cap. Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013) ("a party establishes pretext with evidence that the employer's stated reason or the employment decision was a lie—not just an error, oddity, or oversight") (quotations omitted); *Silverman v. Bd. of Educ.*, 637 F.3d 729, 743-44 (7th Cir. 2011) ("Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action.") (citation omitted).

In truth, and considering the whole record, Mr. Hughes declines to respond to each example or show that Airgas's enforcement of its seatbelt policy was based on discriminatory intent. Instead, he takes issue with certain disciplinary records for one driver. He says this driver's disciplinary records have inconsistent employee identifiers, hire dates, and warning dates and suggests these records could be falsified. This, he argues, could lead a reasonable jury to conclude that Airgas falsified evidence to defeat his lawsuit. Quite aside from ignoring the many other examples of driver discipline offered by Airgas, this argument really invites the jury to speculate about falsified documents, not least when Mr. Hughes has not submitted to the court what he

thinks would show any discrepancy. *See* Fed. R. Civ. P. 56(c)(1)(A); *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) ("Speculation cannot create a genuine issue of fact that defeats summary judgment."). In short, Mr. Hughes cannot show that a jury could reasonably find for him under the indirect method.

Even holistically, no reasonable jury could find for Mr. Hughes. He offers no direct evidence of discrimination or discriminatory intent, nor anything truly suspicious or ambiguous that with the context of a broader record might create a fair inference of it. *See Galvan*, 117 F.4th at 939. From all indications, and accounting for the many employees disciplined by Airgas, the company treated his violations of policy or disrespectful behavior reasonably, and no right-minded jury could say otherwise in concluding that discriminatory bias rather than sound business practice drove the company's decisions. Accordingly, the court must grant summary judgment to Airgas on his discrimination claim under Title VII.

D.  *Retaliation.*

Mr. Hughes alleges that Airgas retaliated against him for complaining about discrimination, including through his EEOC charge, by subjecting him to greater scrutiny of his employment documentation and firing him. Airgas says Mr. Hughes cannot establish that being subjected to greater scrutiny qualifies as an adverse action (or that there is any evidence of this). The company also argues that Mr. Hughes cannot show causation—that any alleged on-the-job scrutiny or even his termination occurred because he complained about discrimination—much less that these actions occurred for pretextual reasons.

In opposition, Mr. Hughes does not really engage with these points, attempt to marshal evidence of retaliation within his pleaded theories, or argue pretext, resulting in waiver and

abandonment. *See Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 713 (7th Cir. 2021) ("party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered"); *Maclin*, 520 F.3d at 788 (abandonment when not argued in summary judgment response).

Even so, the record would not permit a reasonable jury to find retaliation. Title VII prohibits employers from retaliating against their employees because an employee complained of discrimination. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 761 (7th Cir. 2022). To make out a *prima facie* case for retaliation under Title VII, Mr. Hughes must show that (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Miller v. Chi. Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021). Airgas targets the second and third prongs.

For the second, "Title VII's anti-retaliation provision does not protect an employee against 'petty slights or minor annoyances that often take place at work and that all employees experience.'" *Lewis v. Wilkie*, 909 F.3d 858, 867-68 (7th Cir. 2018) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). To qualify as adverse action, Mr. Hughes must show that the employer's action produced an injury or harm. *Id.* For the third, to prove a causal link, Mr. Hughes must adduce evidence that the retaliatory motive was a "but-for cause of the challenged employment action." *Lesiv v. Ill. Cent. R.R.*, 39 F.4th 903, 915 (7th Cir. 2022) (citation omitted). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "Without direct evidence of causation, [a plaintiff] must rely on circumstantial evidence like suspicious timing, ambiguous statements, treatment of similarly-situated employees,

19

and any other relevant information that could permit an inference of retaliation." *Burton v. Bd. of Regents*, 851 F.3d 690, 697 (7th Cir. 2017).

If Mr. Hughes establishes a *prima facie* case of retaliation, Airgas may produce evidence that it had a legitimate non-discriminatory reason for taking the adverse employment action. *Robertson v. Wis. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). If Airgas meets this burden, to avoid summary judgment, Mr. Hughes "must produce evidence that would permit a trier of fact to establish, by a preponderance of the evidence, that the legitimate reasons offered by [Airgas] were not its true reasons but were a pretext for discrimination." *Id.*

Mr. Hughes's retaliation claim based on so-called greater scrutiny of his documentation flounders on both the adverse action and causation prerequisites. First, Mr. Hughes fails to establish that any increased scrutiny—for instance, ensuring his vehicle inspection reports contained no errors or otherwise were corrected—qualifies as adverse action. The record offers no evidence that any increased scrutiny of his documentation (nor any warning for a "making my plate" comment) caused him to suffer real harm.[3] *See Lewis*, 909 F.3d at 868; *Harris v. Firstar Bank Milwaukee, N.A.*, 97 F. Appx. 662, 665 (7th Cir. 2004) (increased scrutiny by supervisors does not constitute adverse action). Most all people working in jobs all across the country face some measure of scrutiny of their job performance, and perhaps along the way receive correction or

---

[3] At the end of a paragraph that covers different legal and factual issues, Mr. Hughes seems to make brief mention of a different retaliation claim—that Airgas retaliated against him by issuing a warning for his comment at the October 18 safety meeting about "making my plate." A new legal theory is one thing, but it is generally impermissible to introduce new claims through opposition to summary judgment. *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023) ("district courts retain discretion to interpret new factual allegations or claims presented in a plaintiff's briefs as a constructive motion to amend"); *see also Signal Funding, LLC v. Sugar Felsenthal Grais & Helsinger LLP*, 136 F.4th 718, 724 (7th Cir. 2025) (difference between theories and claims). The lack of notice and late tender of this claim would not make a constructive amendment appropriate. Mr. Hughes's complaint omits any allegations related to this warning as a separate basis for relief. Even so, on this record, such a claim would not survive on its merits.

stern warnings, without scrutiny or warnings alone being considered discriminatory or retaliatory, particularly when among drivers the company scrutinized documentation comparably.

Second, the record would not permit a jury reasonably to say his EEOC charge caused the company to enhance scrutiny of his documentation. *See Lesiv*, 39 F.4th at 915 (retaliatory motive must be a but-for cause of the challenged employment action). On this point, Airgas submitted evidence showing that documentation from all bulk drivers was reviewed for errors uniformly. Mr. Hughes has not placed this evidence genuinely in dispute.

The court thus turns to whether this record would inferentially link his EEOC charge and his termination as a retaliatory measure. It does not. He doesn't point to any direct or circumstantial evidence showing causation for a reasonable jury. He doesn't attempt to rebut Airgas's argument that he was fired because the company's investigation showed that, after Mr. Hughes received a final warning in November 2023 for his inappropriate comments, he continued to violate Airgas's code of conduct policies by being rude and disrespectful to his coworkers and managers.

The timing of his termination also works against his retaliation claim. *Lalvani v. Cook Cnty.*, 269 F.3d 785, 790 (7th Cir. 2001) ("As the time separating the protected conduct and the adverse employment action grows, the causal inference weakens and eventually time becomes the plaintiff's enemy."). There was a nine-month gap between his EEOC charge and his eventual termination. This lapse of time undermines an inference that Airgas fired Mr. Hughes because he filed an EEOC charge. Just because the rooster crows doesn't mean he caused the sun to rise that same morning, much less nine months later. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966-67 (7th Cir. 2012) (holding five week lapse too long to base a retaliation claim solely on suspicious

timing because "[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action"); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven-week interval too long to raise inference of retaliation); *Filipovic v. K & R Express Sys.*, 176 F.3d 390, 398-99 (7th Cir. 1999) (four months between protected activity and termination was "counter-evidence of any causal connection").

Not least is this true when the company offers a legitimate reason for its termination of Mr. Hughes, which no reasonable jury could call pretextual. *See Morgan v. SVT, LLC*, 724 F.3d 990, 998 (7th Cir. 2013) ("where, as here, there are reasonable, non-suspicious explanations for the timing of [the plaintiff's] termination…we will not deny summary judgment solely on the strength of [suspicious timing]"). Even taking the record in the light most favorable to Mr. Hughes, no reasonable jury could conclude Airgas terminated Mr. Hughes because he filed an EEOC charge in November 2023 or otherwise complained of discrimination.

## CONCLUSION

For these reasons, the court DISMISSES unexhausted claims without prejudice, GRANTS the summary judgment motion consistent with this opinion [27], and DIRECTS entry of judgment for Airgas Inc. accordingly. This order terminates the case.

SO ORDERED.

June 12, 2026                                    *s/ Damon R. Leichty*
                                                 Judge, United States District Court

22